**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No. 2:07-cr-00145-KJD-PAL |
| | ) | |
| vs. | ) | **REPORT OF** |
| | ) | **FINDINGS AND RECOMMENDATION** |
| JASON F. INMAN, A/K/A "J-BIRD," | ) | |
| | ) | (Mtn Suppress - Dkt. #405) |
| Defendant. | ) | |
| _____ | ) | |

Before the court is defendant Jason F. Inman's Motion to Suppress (Dkt. #405) which was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. The court conducted an evidentiary hearing on February 5, 2009. At the conclusion of the evidentiary hearing, counsel for Inman requested an opportunity to file supplemental points and authorities on a Sixth Amendment issue. The court gave counsel for the defendant two weeks to file supplemental points and authorities and the government two weeks from service of a supplemental memorandum in which to file a responsive memorandum. The court has considered the original motion, the Government's Response (Dkt. #460), Inman's Supplemental Points and Authorities in Support of Defendant's Motion to Suppress Statement (Dkt. #518), the Government's Response to Defendant's Motion to Suppress and Supplement (Dkt. #528), and the evidence adduced and arguments of counsel at the evidentiary hearing.

**BACKGROUND**

Inman is charged in a Superseding Indictment (Dkt. #181) returned May 20, 2008 with conspiracy to engage in a Racketeer Influenced Corrupt Organization ("RICO") in violation of 18 U.S.C. § 1962(d). The superseding indictment alleges that Inman is a "Bolt Holder" of the Aryan Warriors, a race-based criminal gang operating inside the Nevada state prison system. He is alleged to

1  have conspired with his co-defendants to commit criminal acts to further the purpose of the Aryan

2  Warriors criminal enterprise in a pattern of racketeering activity.  The indictment alleges that as a "Bolt

3  Holder" of the Aryan Warriors, Inman "engages directly and indirectly in criminal acts including, but

4  not limited to, drug trafficking, violent acts, extortion, corruption of public officials, unauthorized use

5  and possession of access devices, and gambling schemes."  Superseding Indictment (Dkt. #181), ¶ 24.

6  A "Bolt Holder" is a "full member" of the Aryan Warriors.  Id., ¶ 9.  To become a full member, a

7  prospect must commit an act of violence on another inmate at the direction of Aryan Warriors' leaders.

8  A Bolt Holder is "expected to continue to engage in acts of violence at the direction of the Horn

9  Holders [leaders] to eventually advance and become a Horn Holder."  Id., ¶¶ 8, 9.

10  **I.    The Parties' Arguments**

11      **A.    Inman's Motion to Suppress**

12      In the current motion, Inman seeks to suppress statements made January 19 and 20, 2006 while

13  incarcerated in the Clark County Detention Center ("CCDC"), awaiting sentencing on a state charge of

14  conspiracy to violate the Controlled Substance Act by introducing drugs into the Nevada state prison.

15  On both days, he was interviewed by Special Agent Travis Johnson of the FBI and Kelly Reynolds of

16  the Nevada Attorney General's Office who were part of a joint state and federal anti-terrorism task

17  force investigating the Aryan Warriors.  Inman seeks to suppress inculpatory admissions made during

18  these interviews, asserting Johnson and Reynolds made promises of leniency, offered to help him find

19  employment, and threatened him with greater punishment if he did not agree to cooperate by providing

20  information about the Aryan Warriors and his involvement in the organization.  The motion asserts that

21  Inman was dissuaded from seeking counsel and was induced by promises of leniency, which were not

22  fulfilled, to make inculpatory statements.  He asked for an evidentiary hearing, asserting the evidence

23  would establish that he did not knowingly, voluntarily, or intelligently waive his right to counsel or

24  knowingly waive his right to remain silent.  Rather, Inman argues, he was manipulated by experienced

25  agents to waive his rights and "threatened, cajoled and tricked" into waiving his rights.

26      In his supplemental points and authorities, Inman argues, citing Massiah v. United States, 377

27  U.S. 201 (1964), that the agents who interviewed him in the CCDC either knew or should have known

28  that he was represented by counsel, and that their failure to contact his counsel prior to interviewing

him violated his Sixth Amendment Rights.  Counsel for Inman argues that Inman was "desperately in need of counsel" before speaking to Johnson and Reynolds because he was facing state charges and was aware he was being investigated for federal RICO violations.  At the time of the interview, Inman was both fearful of the Aryan Warriors gang members and concerned about the outcome of his pending state case and the possibility he would be indicted on federal RICO charges.  Counsel for Inman acknowledges that Inman asked to speak to Investigator Kelly Reynolds but asserts that the government overreached by interviewing him without first contacting Inman's state case counsel before debriefing him on January 19, 2006.  Acknowledging that Inman initially contacted Reynolds, counsel for Inman argues Johnson and Reynolds "knowingly exploited his vulnerability by interrogating him without ever notifying his counsel."  Supplemental Points and Authorities (Dkt. #518), 5:25-26.  Finally, Inman argues Johnson and Reynolds "promised, directly or impliedly to him, that they would not use anything against him of an incriminating nature."  Id., 5:28 - 6:1.  He characterizes their representations as deceitful and manipulative behavior that violated Inman's Sixth and Fourteenth Amendment rights.

## B.    The Government's Response

In response, the government argues that Inman requested a meeting with Investigator Kelly Reynolds while he was in custody in CCDC.  Before interviewing Inman in CCDC, Reynolds and Johnson read Inman his Miranda warnings, using a standard FBI "Advice of Rights" form which Inman initialed and signed.  The government denies that Johnson and Reynolds made any promises to Inman to induce him to talk and contends that he was not threatened, tricked, or cajoled into waiving his rights.  The government asserts that his statements were voluntary and, therefore, admissible.

The government's response to Inman's supplemental points and authorities argues that because it is undisputed Inman initiated the meeting with Reynolds, he could, and did, waive his right to counsel under the Sixth and Fourteenth Amendments.  Thus, the court should determine only whether Inman's statements were knowing and voluntary after receiving and waiving his rights under Miranda.  The government also relies on a line of Supreme Court decisions holding that the right to counsel under the Sixth Amendment does not attach until a defendant is charged and is offense-specific.  Police officers may constitutionally talk to suspects about uncharged crimes, even those that are "factually related" to an offense with which the defendant is charged and represented by counsel.  Although the government

1    acknowledges that Inman's state drug charges were related to his activities as an Aryan Warrior, his

2    federal RICO conspiracy charge and his state drug charges are not the same offenses and are prosecuted

3    by separate sovereigns.  Finally, the government asserts that because Inman received and signed an

4    Advice of Rights form before the interview which expressly acknowledged that anything he said could

5    be used against him and testified at the evidentiary hearing that he knew Reynolds could only talk to her

6    boss, his testimony that he expected that "nothing would come of it" is "ludicrous."

7    The government has attached certified copies of Inman's Guilty Plea Agreement, Amended

8    Information and Judgment of Conviction in the state drug case which was pending at the time of the

9    interview and moves for the admission of these documents pursuant to Federal Rule of Evidence 902.

10    The exhibits establish that Inman entered into a guilty plea agreement, pled guilty to attempt conspiracy

11    to violate the Uniform Controlled Substances Act on January 25, 2006, and was sentenced to twelve to

12    thirty months on March 16, 2006.

13    **II.    Evidence Before the Court**

14    The government attached the Advice of Rights form which Inman initialed and signed on

15    January 19, 2006 at CCDC as Exhibit "1" to the government's Response (Dkt. #460) which was

16    marked and admitted as government's Exhibit "1" at the evidentiary hearing.  The government called

17    three witnesses, and Inman testified on his own behalf.

18    **A.    Testimony of Anthony Ruggiero**

19    Ruggiero is currently employed as a chief investigator for the Nevada Consumer Affairs

20    Division.  However, in January 2006, he was an investigator with the Nevada Attorney General's

21    Office.  Sometime in January 2006, he was assigned to transport Inman from a northern Nevada prison

22    to CCDC.  He met his northern Nevada counterparts in Tonopah, Nevada, at the Department of

23    Transportation building where Inman was transferred to his custody.  Inman was in custody on an

24    outstanding warrant arising out of an Attorney General's Office investigation.  Ruggiero was

25    accompanied by his partner, J.T. Healy.  Ruggiero and Healy took Inman in their custody and placed

26    him in their vehicle to take him to CCDC.  Because the vehicle did not contain a cage or protective

27    shield between the front and back seats, Inman was placed on the passenger side of the back seat, and

28    Ruggiero sat next to him.

Ruggiero testified that when he initially made contact with Inman, he initiated "small talk" to assure Inman that if there were no problems or troubles, this was "just a trip to CCDC." Inman was cooperative and very talkative and began making statements that his case was "no big deal." Ruggiero responded to Inman's initial statements by telling him that before he said anything else, Ruggiero would advise Inman of his rights. Ruggiero took out his standard Advisement of Rights card which he always keeps in his wallet and read Inman his <u>Miranda</u> warnings. Ruggiero read into the record the contents of the Rights of Persons card from which he advised Inman of his <u>Miranda</u> rights. Inman responded that he understood.

During the transport, Ruggiero described Inman as a "nice enough young man" who was very comfortable and very talkative en route. Inman talked about his new girlfriend and described his charges as "no big deal." He also began describing to Ruggiero how to make methamphetamine by the "cold method," stating that the product was not as good as the more traditional method but "still good." Inman also started talking about his state case and indicated that Kelly Reynolds was the investigator. Ruggiero knew who Kelly Reynolds was but had no idea that she was the investigator in Inman's case. Ruggiero did not question Inman about his pending state case and testified that "to this day" he had "no idea what it is about." Inman asked Ruggiero to tell Reynolds Inman wanted to see her. Ruggiero described the transport as "an uneventful ride." When they arrived at CCDC, Inman was turned over to the custody of a corrections officer at the facility, and Ruggiero and his partner left.

On cross examination, Ruggiero testified that although he had worked before with Kelly Reynolds at the Attorney General's Office, they were in different units and did not often work together. During Inman's transport to CCDC, the only inculpatory statements Inman made were about his knowledge about how to make methamphetamine. Ruggiero reiterated that although he was aware Inman was being taken into custody on a warrant, he did not know what Inman was charged with when he picked up Inman. He had not spoken with Reynolds and was not aware that Inman was in custody on her case until Inman mentioned it during the ride. He was not aware that Inman was believed to be an Aryan Warrior. Ruggiero did not make any promises to Inman if he cooperated or made statements. He only said he would tell Kelly Reynolds that Inman wanted to talk with her. Inman was very talkative during the ride, and Ruggiero would be surprised to hear that Inman had previously refused to

1   talk to law enforcement officers.  Inman just said he wanted to take care of his pending case and that it

2   was no big deal.  Ruggiero did not have any information about his case or any authority to assist Inman

3   to resolve his case.

4           **B.      Testimony of Kelly Reynolds**

5           Reynolds is a senior investigator with the Nevada Attorney General's Office.  She has been

6   employed by the Nevada Attorney General's Office as a law enforcement officer since 1996.  She has a

7   degree in Criminal Justice, completed the Police Academy, and has a Category One POST Certification

8   and Advanced POST Certification.  In January 2006, she was an investigator with the Nevada Attorney

9   General's Office and was involved in an investigation involving Inman for some time.  She did not

10  specifically recall for how long but believed it was since May 2005.  She obtained a warrant arising out

11  of her investigation from a state judge for Inman's arrest on a charge of introducing drugs into the

12  Nevada state prison system.  The investigation intercepted phone calls and letters between inmates and

13  women on the outside who were being used to introduce drugs into the prison system.  Prior to January

14  2006, she had not interviewed Inman in connection with her investigation but had interviewed other

15  witnesses.  She did not specifically recall when the warrant was filed but knew it was sometime prior to

16  January 2006.  At the time the warrant was returned, Inman was still incarcerated at High Desert State

17  Prison.  A detainer was placed on him as a result of the new state charge.  Inman finished his sentence,

18  was taken to court on the new charge, and was released on bail on the charge arising out of her

19  investigation.  He was in Las Vegas, was released on bail, and at some point went to Reno.

20          Reynolds became aware Inman was arrested in Reno and believed it was on a battery domestic

21  violence charge.  This new arrest violated the conditions of his bail, and he was, therefore, taken back

22  into custody on the state charge involved in her investigation.  Reynolds found out that Inman was in

23  CCDC from Ruggiero who had transported him to CCDC.  Ruggiero told her that Inman wanted to talk

24  with her.  As a result, Reynolds contacted Special Agent Travis Johnson.  She and Johnson were

25  members of a joint task force on terrorism, working on an investigation of the Aryan Warriors.  Both

26  went to see Inman at CCDC.  Inman was placed in an interview room by corrections officers.  She

27  described the interview room as sparse with a table and a couple of chairs.  It was a ten by twelve-foot

28  or twelve by twelve-foot room with a window that was covered.  Both officers were in plainclothes and

unarmed.  Inman was not in handcuffs while he was interviewed and was "very eager to speak with us."  Prior to the interview, the agents mirandized Inman, using a standard FBI Advisement of Rights form.  The rights were read aloud to Inman, and he was instructed to read along.  Inman initialed and signed the form.  Exhibit "1" was identified as the Advice of Rights form which Inman initialed and signed on January 19, 2006, acknowledging he had read, understood, and waived his rights.  Both Reynolds and Johnson also signed the form.  Although he had asked to speak with Reynolds, Inman was advised of his *Miranda* rights because he was in custody.  Reynolds was "very confident" Inman understood his rights and reiterated that he was willing and eager to talk.

Reynolds initiated the interview with the question, "Tell me about the Aryan Warriors."  The interview lasted approximately one and a half hours.  Exhibit "2" is the FBI 302 summary of the interview that Special Agent Johnson prepared, and Reynolds signed.  It accurately summarizes the substance of the interview with Inman on January 19, 2006.  She summarized some of the information Inman provided during the interview about the Aryan Warriors in her testimony.

Reynolds testified that Inman was not promised anything.  When asked whether Inman asked her for anything, Reynolds responded that Inman offered to work for them.  Inman said he was going to be released, and he could work for the investigators on the outside.  Inman was confident he was going to be released.  Reynolds responded that they would consider what he had told them and consider his offer.  Reynolds was asked what, if anything, she discussed with Inman concerning his state pending charges.  Reynolds told Inman that she could not make any offers or promises but that she would speak to the prosecutor on the case and let the prosecutor know that Inman was cooperating.  Reynolds did not tell Inman anything about a joint terrorism task force investigating the Aryan Warriors or that there was a pending federal investigation.  Reynolds could not recall Inman asking her about any federal investigation.  Special Agent Johnson was identified as Agent Johnson.  She could not recall whether he was introduced as an FBI agent or whether she told Inman Johnson was from the FBI.

In response to a question about whether Inman expressed any concerns regarding when he got out of custody, Reynolds testified he was supposed to contact Egan.  Inman stated he was concerned because he had not contacted Egan and, therefore, might be on a hit list.  Egan had contacted Inman's mother to relay a message that Inman should call Egan.

7

When asked what Reynolds did for Inman after the interview, Reynolds responded "nothing at all."  After the interview, she contacted Special Agent Hunt [the federal case agent] to advise him of the interview and Inman's offer and to inquire whether Hunt was interested in having Inman work for the government.  Hunt responded that he did not believe Inman would be "trustworthy or credible out loose on the streets" and was not interested in having him work for the government.

On cross examination, Reynolds testified that she did not recall whether she had had any prior contact with Inman before January 19, 2006.  When asked how Inman knew her name to request that she see him, Reynolds responded that she was the investigator who submitted the criminal complaint.  She went to CCDC with Special Agent Johnson to get information about the Aryan Warriors.  She did not recall whether the first question Inman asked was what Reynolds could do for him.  She was not aware of the number of his prior convictions but was aware he had been incarcerated in the past.  She did not recall whether he had an attorney assigned and did not recall whether she checked out whether he had an assigned attorney, although this is something she would ordinarily do.  She did not recall whether she did so this time.  She did not recall whether she was aware of Inman's education, but she did not believe he had a college education.  She would not be surprised if he had a tenth or eleventh grade education.  He understood English, read the form, and based on that, she believed he understood his rights.

She testified Inman wanted to speak with her.  When asked whether Inman had some fear he might be in jeopardy, she responded she did not know.  When asked about the statements Inman made about Egan and being on a hit list, Reynolds could not recall Inman asking for protection.  Reynolds was aware that Inman wanted something from her for cooperating, but did not recall whether Inman asked her for something "right up front."  Reynolds and Johnson did go back to CCDC the next day and told Inman they were not interested in having him work for the government.

Inman's statements to Reynolds and Johnson at CCDC were not recorded.  When asked whether it is the policy of the Attorney General's Office not to record statements, Reynolds responded it was discretionary with the interviewing investigator.  The FBI was in charge of the investigation.  Johnson was not identified as an FBI officer, did not show his FBI credentials, and Reynolds did not recall whether Johnson was asked to show his credentials.  He was identified as her partner.  She did not

1   know whether Inman would have been willing to give a statement if he was aware he was talking to the

2   FBI as opposed to someone from the state Attorney General's Office.  Inman wanted to cooperate.  The

3   January 19, 2006 interview lasted an hour and half, and there were no problems during the course of the

4   interview.  Inman was not asked to give a written statement.

5   On redirect, Reynolds testified that the fourth line on the Advisement of Rights form Inman

6   signed prior to the interview advised him that he had the right to talk with a lawyer before questioning.

7   She also testified that she was aware Inman pled guilty to the criminal complaint for introducing drugs

8   into a prison facility.

9   In response to questions from the court, Reynolds acknowledged that when she interviewed

10   Inman at CCDC on January 19, 2006, she was aware that Inman was in custody on the state felony

11   charge for introducing drugs into a prison facility.  She was also aware that he had gone to court, had

12   been released on bail, and was rearrested on a subsequent battery domestic violence case.  She

13   understood he had appeared in Nevada state court and understood that he had counsel.  However, she

14   did not talk with Inman at all about whether he wanted counsel present except for reading the

15   information about his right to counsel from the Advice of Rights form.

16   On further redirect examination from counsel for the government, Reynolds was asked whether

17   she discussed the pending state charges for which Inman had appointed counsel with Inman.  Reynolds

18   responded that she indicated that she would speak to the prosecutor and notify the prosecutor that Mr.

19   Inman was cooperating.

20   **C.      Testimony of Travis Johnson**

21   Johnson is a special agent with the FBI who was stationed in Las Vegas between June 2003 and

22   May 2006.  He was assigned to the joint terrorism task force and participated in an investigation of the

23   Aryan Warriors.  The investigation was ongoing, and no charges had been filed at the time of his

24   transfer.  In January 2006, he was asked by Kelly Reynolds to participate in an interview of Inman at

25   CCDC.  He had only been involved in the investigation for approximately one month and described his

26   knowledge of the investigation as "terse."  Reynolds asked most of the questions while he took notes to

27   record what was said.  The interview occurred in an interview room at CCDC.  Neither officers were

28   armed, and he did not believe that Inman was in handcuffs during the interview.  The interview began

1   with Investigator Reynolds reading Inman <u>Miranda</u> warnings and showing Inman the Advice of Rights

2   form.  Inman initialed each right and signed the written waiver.  Johnson identified his signature as a

3   witness on Exhibit "1."  Government's Exhibit "4" was identified as eleven pages of the handwritten

4   notes he took during the interview.  The last page of Exhibit "4" is a photocopy of the Advice of Rights

5   form Inman signed.  Johnson could not recall if he asked Inman any questions during the interview.

6   Reynolds introduced Johnson as her partner, not as an FBI agent.

7       When asked how the interview began, Johnson responded that Inman asked a couple of

8   questions.  However, he could not specifically recall what questions Inman asked.  Reynolds was not

9   receptive to providing Inman any information.  Johnson testified that they were not there to answer his

10  questions, and "it was supposed to be the other way around."  Inman asked questions about the Aryan

11  Warriors' investigation.  The point of this interview was to obtain any information Inman wanted to

12  provide about his participation in the Aryan Warriors.

13      Johnson stated that neither he nor Reynolds made Inman any promises for divulging information

14  about the Aryan Warriors.  Inman did not specifically ask for anything.  Inman "implied" he would

15  provide evidence for the government against the Aryan Warriors.  Johnson took as many notes as

16  possible because he was not familiar with the organization, and many nicknames were used referring to

17  the different members.  He did not have an understanding of all of this and wanted to write an accurate

18  report.  Special agents are not allowed to make any promises.  If Inman had asked for any promises,

19  Johnson would have recorded his requests in the notes.

20      Johnson characterized the atmosphere during the interview as regular conversation in which

21  Reynolds was asking the questions, and Inman answered and elaborated.  When asked whether Inman

22  expressed any fear about his involvement in the Aryan Warriors during the interview, Johnson

23  responded that at one point Inman said he may have had a hit against him by the Aryan Warriors.

24  When asked whether the investigators made any promise of protection against the Aryan Warriors,

25  Johnson responded "nothing."  After the interview, Johnson compiled his notes in a written FBI 302

26  report.  He also communicated with Special Agent Hunt in a telephone conference or by e-mail

27  describing what happened in the interview.

28  ///

10

1    At the conclusion of the January 19, 2006 interview, Reynolds and Johnson told Inman they

2  would take his willingness to work for the government back to their supervisors and report back to him.

3  Johnson and Reynolds returned to CCDC the following day and told Inman that all of the information

4  he had provided was historical, that he had not provided any useful information, and that unless he had

5  anything more significant to add, "there would be nothing more we would doing with him."  The

6  interview was not tape recorded because it requires special approval within the FBI, and they did not

7  have time to seek approval.  At no point during the interview did Inman seek to terminate the interview

8  or ask for a recess or pause.

9    During the January 20, 2006 interview, Inman's "whole mood had changed."  His posture was

10  in a closed position with his arms crossed and had a "closed-off attitude" before anything was said.

11  Inman was again mirandized before the January 20, 2006 interview.  Johnson believed a written waiver

12  was obtained and preserved for evidentiary purposes.

13    On cross examination, Johnson testified that he had only been working on the Aryan Warriors'

14  case for about a month prior to the January 19, 2006 interview at CCDC.  He spoke with Reynolds at

15  the FBI office before the interview.  When asked whether persons in prison who are being interviewed

16  normally expect something in return for cooperation, Johnson responded that he had not interviewed

17  many suspects in prison and that this was perhaps the second or third time he had interviewed someone

18  in prison.

19    Johnson testified that he did not know whether Inman had an attorney and that Inman did not

20  "specify" he had an attorney.  However, Johnson acknowledged that most people who are in jail have

21  an attorney.  Inman did not specifically ask for any promises and did not state he wanted his state

22  sentence changed.  Johnson could not recall whether Inman asked for protection when mentioning there

23  might be a hit against him.  Johnson did not believe Inman when he stated there might be a hit against

24  him and did not take his statement about a hit seriously because Inman was still in the Aryan Warriors.

25  Additionally, Inman was no longer incarcerated in Ely, Nevada, and there were no Aryan Warriors

26  present in CCDC to his knowledge.

27    Johnson reiterated that on January 20, 2006, Inman was told the case agent decided that his

28  information was "history" and could not be used.  Inman was not told that the information he had

1   provided Reynolds and Johnson could not be used against him.  Neither Johnson nor Reynolds

2   suggested otherwise.  The purpose of interviewing Inman at CCDC was not to talk about his state

3   charge but to interview him about the Aryan Warriors.  Johnson did not believe Inman was expressly

4   told this and testified that he did not believe they needed to inform him of this because Inman knew

5   why they were there.  Johnson also reiterated he did not recall what Inman's questions were to the

6   investigators.  Johnson testified he did not take any notes memorializing what questions Inman asked

7   because "we weren't there to provide information" to Inman.

8          **D.    Testimony of Jason Inman**

9          Inman was canvassed by the court and acknowledged he was aware that he had the right to

10  testify or not and could not be compelled to testify.  After discussing the matter with counsel, he

11  decided he wanted to testify.  He was advised by counsel of his rights and possible adverse

12  consequences of testifying, including for sentencing purposes.

13         Inman is thirty-three years old and graduated from Sparks High School.  For fourteen and a half

14  of the last fifteen years, he has been incarcerated.  He has six felony convictions for possession of a

15  stolen motor vehicle, possession of a controlled substance, two convictions for conspiracy to violate the

16  Controlled Substance Act, and attempted auto burglary.  His most recent conviction occurred in January

17  2006.  He also has a misdemeanor battery conviction.  He was released from CCDC on his most recent

18  state felony drug charge on July 25, 2005 when his family posted bail on his behalf.  He received

19  permission to leave Las Vegas and went to Reno where he had a girlfriend, got a job, and was staying

20  out of trouble until his arrest for domestic violence.  As a result of this arrest, he was brought back to

21  Las Vegas after making a deal in Reno with authorities to run the battery domestic violence conviction

22  concurrent with the pending felony charge of conspiracy to violate the Controlled Substance Act

23  pending in Las Vegas.  He did this because he knew the Attorney General's Office would have to pick

24  him up before the expiration of his six-month sentence on the misdemeanor battery charge.

25         He recognized Ruggiero as the officer sitting next to him in the back seat while he was

26  transported from Northern Nevada to CCDC.  Ruggiero and his partner were "real nice," gave him

27  cigarettes, and they engaged in small talk during the ride.  Inman knew that Reynolds had been

28  investigating him for years and asked Ruggiero to talk with Kelly Reynolds because Inman wanted to

1   talk with her.  Inman was aware at the time he asked Ruggiero to ask Reynolds to visit him that he was

2   being investigated for RICO charges.  However, Inman did not mention any RICO investigation to

3   Ruggiero.  He merely told Ruggiero he wanted to talk to Kelly Reynolds.

4           Inman testified that on three or four prior occasions, he had been contacted by law enforcement

5   officers for an interview.  He believed the first time he was contacted was on October 15, 2004 when

6   his girlfriend and another girl were being investigated about smuggling drugs into the prison.  Two

7   officers brought a tape recorder with them.  Inman and his co-defendant remained silent and said

8   nothing.  The interview occurred at the High Desert Prison.  The officers were asking questions about

9   his drug case but not about the Aryan Warriors.  Inman walked out of the interview.

10          The second interview occurred sometime after "Blind Man" was stabbed in January 2005.

11  Special Agent Bob Hunt and Mike Quick came to interview him.  Inman testified that he knew that

12  Hunt was the "shot caller" although Hunt did not ask many questions.  The second interview also

13  occurred at High Desert.  Inman made no statements.  However, the officers told him he should

14  cooperate because the "boat was sinking and there are only a few life rafts," and Inman wanted to be on

15  one of them.  The agents did not ask Inman much but talked to him and made him feel like he was

16  "pretty much screwed."  Inman asked what the agents wanted, stating he was a "nobody."  The agents

17  responded "we know you are a nobody, but tell us about money you were kicking up to the

18  Brotherhood."

19          Approximately three months later, Bob Hunt and Mike Quick again came to see him at High

20  Desert.  The agents told him that this was his last chance before he got out of custody "to jump on a life

21  raft."  The agents received special permission from the warden to have Inman's girlfriend, Marian

22  Downs, present during the interview.  The agents wanted Inman and Downs to cooperate and did most

23  of the talking.  Inman told the agents that there was nothing he could add and that the agents knew more

24  about the Aryan Warriors than he did.  Inman was told that his choices were to be debriefed or get

25  indicted.  Inman responded no because he did not kick money up to the Aryan Warriors and did not stab

26  Blind Man.

27          When asked on direct examination why he changed his mind and decided to talk with Reynolds

28  in January 2006, Inman responded that he wanted help on his state case, and he did not want to be

13

1    indicted on RICO charges.  He was promised that if he did not debrief, he would be "RICO'd."  Six to

2    eight months had passed since he was last interviewed by law enforcement.  What changed his mind

3    was the fact that he was out, he had a job and a girlfriend, and he did not want to go back to prison.

4    Inman asked Reynolds if she would keep him out of prison if he talked.  Reynolds responded that she

5    would go and talk with her boss and that they could not make any promises right there.  Reynolds told

6    Inman three times during the January 19, 2006 interview that she was not wearing a wire in response to

7    his questions concerning whether she was.  Inman understood that "nothing would ever come of" his

8    January 2006 interviews with Reynolds and Johnson.  Inman believed this "because it wasn't being

9    recorded."  Inman did not realize who Johnson was and would not have given a statement if he realized

10   Johnson was FBI.  Inman has read Johnson's 302 report of the interview and initially responded that the

11   report was accurate.  However, he immediately modified his statement to clarify that a lot of it was

12   accurate, but not all of it.

13          Inman testified he told Reynolds and Johnson that there was a hit out on him and that he wanted

14   protection.  That was the whole point of his interview.  He had been released from jail and asked for

15   permission to leave Las Vegas and could not get out of there soon enough.  He had made promises to

16   "these guys," but he had not kept his promises and was worried for his safety.  He was still willing to

17   assist but wanted some assurances they [the government] would help him.  He had promised the Aryan

18   Warriors he would be involved in the street program in Las Vegas but had not kept his promise.

19          Inman agreed that when he was interviewed the following day on January 20, 2006, his mood

20   had changed.  He had been contacted by co-defendant Egan in CCDC.  Egan had contacted Inman's

21   mother and told her that Inman should call Egan.  Inman called Egan.  Egan told Inman he just got out

22   of jail eleven days ago and "hold your mud or else."  Inman was afraid of Egan.  Inman explained to

23   Reynolds and Johnson that he had been contacted by Egan and that this was the reason for his change in

24   attitude.  Inman asked Johnson and Reynolds for help on January 20, 2006.  They said no.  Evidently,

25   they had spoken to Bob Hunt who said nothing helped, nothing hurt.  Inman testified "they promised

26   me nothing would ever come of it – ever."  They told Inman they were there because they said they

27   would come back, and "nothing will come of this."  Reynolds and Johnson also asked Inman about

28   additional information about what was going on in Pahrump at the second interview on January 20,

2006, but Inman could not help them.  Inman had not been in Pahrump or Las Vegas for any length of time and testified he did not know "these people down here."  He testified he did not know any of his co-defendants except for Egan and Crossman.

On cross examination, Inman acknowledged that he has heard of most of these guys, referring to his co-defendants, but had never met Sellers or Krum.  He reiterated that he did not ask for an attorney before speaking with Reynolds and Johnson and that he asked to talk to Reynolds because he wanted her help on his pending state case.

He has been in prison for many years and knows it is common to be interviewed concerning attacks in prisons.  He denied that he was associated with the Aryan Warriors but stated he had been on the same yard with these guys for fifteen years.  He realized he was under investigation in the Aryan Warriors case in January or February 2005 when Reynolds served a search warrant on Marian Downs' house.  In approximately March 2005, agents came to see him about the Aryan Warriors.  Inman did not know that Reynolds was involved in the Aryan Warriors investigation but knew she served a search warrant concerning state drug charges.

He spoke with Reynolds about the Aryan Warriors because that is all she wanted to talk to him about.  He reiterated that Reynolds and Johnson told him that nothing would come of his interview because it was not going to help or hurt him.  Inman was not promised that he would not be charged or that he would be given immunity for his statements.  They did not make him any promises other than they were going to talk to their bosses and get back to him.  Inman went over the Advice of Rights form before the interview and did not ask for an attorney before the interview.

By January 2005, he was aware of the federal government's interest in him in the Aryan Warriors investigation.  The reason he wanted to speak with Reynolds in January 2006 was to discuss the Aryan Warriors, and that was all that was discussed in the interview.  Reynolds and Johnson did not scare him at any point during the interview and did not make any specific promises to him other than that they would talk to their bosses.  Neither Johnson nor Reynolds threatened Inman at any point during the interview.

In response to questions by the court, Inman testified that he agreed to speak with Reynolds and asked her for help on his state case and to talk to the FBI about RICO charges.  Reynolds told Inman

1   that she would talk to her bosses and whoever else was in charge of the investigation and come back to

2   see him.  Reynolds clearly conveyed that she did not have any authority to promise him anything.

3   However, Reynolds said she would check with Bob Hunt and her boss to see what, if anything, they

4   could do for him.  When Reynolds returned the following day, she said they could not do anything for

5   him and that nothing would come of his statements.  He understood this to mean his statements would

6   not be used against him.  When he went for sentencing on his state court case, he was represented by

7   counsel who was present.  No one on behalf of the state told the judge anything with respect to whether

8   he had or had not cooperated.

9                               **DISCUSSION**

10       **A.    Inman's Fifth Amendment Arguments**

11           The Fifth Amendment provides in pertinent part that "[n]o person . . . shall be compelled in any

12   criminal case to be a witness against himself."  U.S. Constitution, Amendment V.  The privilege against

13   self incrimination applies to the states through the Fourteenth Amendment.  See Malloy v. Hogan,

14   378 U.S. 1, 8 (1964).  In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court established

15   a procedural mechanism to safeguard the Fifth Amendment privilege against the inherently coercive

16   nature of custodial interrogation.  Miranda held that before the prosecution can admit a defendant's

17   incriminating statement, it must prove that the accused waived his or her right against self

18   incrimination.  The decision created the requirement to administer *Miranda* warnings which are so well

19   known, that they "have become part of the national culture."  Dickerson v. United States, 530 U.S. 428,

20   443 (2000).

21           "For inculpatory statements made by a defendant during custodial interrogation to be admissible

22   in evidence, the defendants 'waiver of Miranda rights must be voluntary, knowing, and intelligent.'"

23   United States v. Garibay, 143 F.3d 534, 537 (9th Cir. 1998).  "The validity of a Miranda waiver

24   depends on the totality of the circumstances and whether the defendant 'was aware of the nature of the

25   right being abandoned and the consequences of the decision to abandon it.'"  United States v. Labrada-

26   Bustamante, 428 F.3d 1252, 1259 (9th Cir. 2005) (citing United States v. Younger, 398 F.3d 1179,

27   1185 (9th Cir. 2005)).

28   / / /

There is a presumption against waiver. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1966). The prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his <u>Miranda</u> rights.  <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).  To meet its burden, the prosecution must establish that under the "totality of the circumstances," the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

Inman argues he did not knowingly, voluntarily, or intelligently waive his right to counsel or his right to remain silent but was manipulated by experienced agents to waive his rights and "threatened, cajoled and tricked" into waiving his rights.  The record before the court does not support these arguments.  There was also no support in the record developed at the evidentiary hearing to support statements made in his written motion that he was promised leniency, offered help in finding employment, or threatened with greater punishment by Reynolds and Johnson.

It is undisputed that Inman asked to speak to Reynolds while being transported to CCDC by Ruggiero and his partner.  Ruggiero testified Inman was very talkative, initiated conversation, and began making statements that his pending state court case was "no big deal."  As a result, Ruggiero advised Inman of his <u>Miranda</u> rights, reading from a standard Advisement of Rights card he always keeps in his wallet.  Inman indicated he understood his rights and made inculpatory statements about his knowledge of methamphetamine manufacturing methods.  During the ride, he asked Ruggiero to tell Reynolds he wanted to see her.

It is undisputed that before Reynolds or Johnson asked Inman any questions in CCDC on January 19, 2006, he was handed the Advice of Rights form and told to read along as his rights were orally recited.[1]  Inman placed his initials before each of his enumerated rights and signed the Waiver of Rights form.  The waiver of rights was witnessed by both Reynolds and Johnson.  Reynolds and

---

[1]   The form stated: "Before we ask you any questions, you must understand your rights.  You have the right to remain silent.  Anything you say may be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time."

17

1    Johnson both testified that Inman was eager to talk to them.  Inman himself acknowledged that he asked

2    to speak with Reynolds and wanted to talk with her.  He did not claim in his testimony that he did not

3    understand his rights.

4         The court finds that Inman received and waived his <u>Miranda</u> warnings.  He signed a written

5    waiver after initialing each of his <u>Miranda</u> rights, acknowledged he understood his rights, and wanted to

6    talk with Reynolds and Johnson.  Inman is not a stranger to the judicial system.  He testified he has six

7    felony convictions.  He also testified that he was interviewed by law enforcement officers while in

8    prison on three separate occasions, declined to make any statements, and walked out of the interview on

9    one of these occasions.  Special Agent Bob Hunt, the case agent in this case, was present during two of

10   the three interviews.  Inman testified he recognized Hunt was the "shot caller," or person in charge,

11   even though Hunt said very little during either of the interviews.  Inman's familiarity with the criminal

12   justice system and knowledge of his legal rights is also illustrated by his testimony that after being

13   arrested for the battery domestic violence charge, he made a deal with the state to serve six months

14   concurrent with his pending felony drug charge.  He did so because he knew doing this would require

15   the Attorney General to pick him up on his pending felony charge before the expiration of his six-

16   month sentence.

17        Inman also testified about his motivation for wanting to talk with Reynolds about the Aryan

18   Warriors investigation after refusing to cooperate in the three prior interviews he had with law

19   enforcement officers while in prison.  He testified that he wanted help with his state case, and he did not

20   want to be indicted on RICO charges.  He decided to talk with Reynolds because he had been out of

21   custody, had a job and a girlfriend, and did not want to go back to prison.  However, Inman was candid

22   that although he asked Reynolds if she would keep him out of prison if he talked, Reynolds said that she

23   could not make him any promises other than she would talk with Bob Hunt and her boss to see what, if

24   anything, they could do for him.  Inman testified that Reynolds clearly conveyed that she did not have

25   any authority to promise him anything.

26        Reynolds twice testified, on direct and re-direct examination, that she told Inman she would

27   speak to the prosecutor in his state case and let the prosecutor know Inman was cooperating.  However,

28   when she was asked on direct examination whether she did anything for Inman, she testified she did

18

1   nothing at all other than advise the case agent of Inman's offer to cooperate.  At first blush, Reynolds'

2   testimony that she told Inman she would speak to the prosecutor in his state case is inconsistent with

3   her testimony that she made no promises at all.  However, after hearing the testimony of Reynolds,

4   Johnson, and Inman, the court concludes that Reynolds conveyed to Inman that **if** the government

5   decided to take him up on his offer to cooperate, she would speak to the prosecutor in his state case.

6   This is consistent with Inman's own testimony that Reynolds clearly conveyed she did not have any

7   authority to promise him anything and would talk with Bob Hunt and her boss to see what, if anything,

8   they could do for him.

9        The court found Inman to be intelligent, articulate, and for the most part, credible.  The court

10  found Inman's testimony credible that he asked to speak with Reynolds because he knew she had been

11  investigating him for years, and he wanted her help in his upcoming sentencing on his state charge.  The

12  court found Inman credible that he offered to work for the agents to obtain information about the Aryan

13  Warriors in return for the investigators' assistance at his upcoming sentencing, and agreement not to

14  indict him on federal RICO charges arising out of his relationship with the Aryan Warriors.  The court

15  also found Inman credible that he asked Reynolds three times during the interview on January 19, 2006

16  whether she was wearing a wire and that Reynolds assured him she was not.

17       Inman testified that when Reynolds and Johnson returned January 20, 2006, he was told that

18  Reynolds and Johnson had spoken to Bob Hunt who said "nothing helped, nothing hurt," and that

19  Reynolds and Johnson stated, "Nothing will come of this."  The court found this testimony credible.

20  Inman's testimony–that he was told "nothing will come of this" is also remarkably similar to Johnson's

21  testimony that Inman was told on January 20, 2006 on the return visit to CCDC that the information

22  Inman had provided was not useful and unless Inman had something more significant to add, "there

23  would be nothing more we would be doing with him."  The court concludes that Inman may very well

24  have subjectively believed that nothing he said would come back to haunt him in court because his

25  interview was not recorded, Reynolds assured him she was not wearing a wire, and his offer to

26  cooperate was refused.  However, these discussions occurred on January 20, 2006, *after* Inman received

27  and waived his <u>Miranda</u> warnings and spoke with Reynolds and Johnson for an hour and a half.  The

28  / / /

19

1    written waiver of rights form Inman initialed and signed on both dates clearly advised him that anything

2    he said could be used against him in court.

3        The court found Ruggiero credible that while being transported to CCDC, Inman was talkative

4    and made inculpatory statements despite being administered <u>Miranda</u> warnings and talked about his

5    pending state case as "no big deal."  The court also found Reynolds and Johnson credible that they both

6    told Inman they had no authority to offer him anything but would discuss his offer to work for the

7    government with supervisors.

8        The court finds that Inman's waiver of his <u>Miranda</u> rights was knowing and intelligent.  The

9    court also finds Inman's statements to Reynolds and Johnson were voluntary.  In analyzing the

10   voluntariness of a waiver, the focus is on the absence of police overreaching.  <u>United States v. Cazares</u>,

11   121 F.3d 1241, 1244 (9th Cir. 1997) (<u>quoting</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986)).  The

12   test for voluntariness is whether, under the totality of the circumstances, "the government obtained the

13   statement by physical or psychological coercion or by improper inducement so that the suspect's will

14   was overborne."  <u>United States v. Male Juvenile</u>, 280 F.3d 1008, 1022 (9th Cir. 2002) (citation and

15   internal quotation marks omitted).  There is no evidence in the record to support a finding of police

16   overreaching.  Inman himself testified that he did not feel threatened or scared at any point during the

17   interview.  He also testified that Reynolds clearly conveyed she had no authority to offer or promise

18   him anything.  Thus, even if she did tell Inman she would inform the state prosecutor he had

19   cooperated, the Ninth Circuit has held that "inducements to cooperate are not improper and do not

20   render a suspect's statement involuntary unless under the total circumstances, it is plain that they have

21   overborne the free will of the suspect."  <u>United States v. Okafor</u>, 285 F.3d 842, 847 (9th Cir. 2002).

22   The court found Inman to be an intelligent, articulate, astute, and assertive young man.  His will was not

23   overborne by Reynolds or Johnson.  Under the totality of the circumstances, Inman's waiver of <u>Miranda</u>

24   rights was knowing, intelligent, and voluntary.

25        **B.    Inman's Sixth Amendment Arguments**

26        At the time Inman was interviewed by Reynolds and Johnson at CCDC, he was in custody on a

27   state felony drug charge.  Although the government disputes whether Reynolds and Johnson were aware

28   he had counsel appointed in this case, the court concludes otherwise.  Inman was in custody on this

1   charge as a result of Reynolds' investigation.  Reynolds submitted the case for prosecution and obtained

2   a warrant for his arrest.  As a result of that warrant, a detainer was lodged.  At the time the charge was

3   filed, Inman was in prison at High Desert.  When he finished his sentence, he was brought back to state

4   court, made an appearance, and was released on bail.  He received permission to leave Las Vegas and

5   travel to Reno where he was arrested on the battery domestic violence charge which resulted in a

6   violation of the conditions of his bail on the state charge.  Reynolds was aware he had made a court

7   appearance on the charge resulting from her investigation and that Inman had been released on bail,

8   rearrested, and brought back to Las Vegas on her case.  She is an experienced police officer and

9   understood he had made an appearance in court and must have had counsel.  Johnson also testified that

10  he was aware that most people who are in custody have counsel.

11      The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the

12  right . . . to have the Assistance of Counsel for his defense."  U.S. Constitution, Amendment VI.  The

13  right to counsel attaches after initiation of adversarial judicial proceedings.  Kirby v. Illinois, 406 U.S.

14  682, 689 (1972).  United States v. McNeil, 362 F.3d 570, 572 (9th Cir. 2004) (right to counsel attached

15  at indictment).  However, the Sixth Amendment of right to counsel is "offense specific."  McNeil v.

16  Wisconsin, 501 U.S. 171, 175 (1991).  The Sixth Amendment right to counsel is not violated when a

17  defendant is questioned regarding offenses for which he has not been charged.  Id.  Inman was in state

18  custody for introducing drugs into the state prison system.  The government concedes that his drug

19  charge was related to his activities as an Aryan Warrior and this federal RICO conspiracy charge.

20  However, the government cites Texas v. Cobb, 532 U.S. 162 (2001), to support its position that Inman

21  did not have a Sixth Amendment right to counsel on the uncharged offenses Reynolds and Johnson

22  interviewed him about in CCDC on January 19 and 20, 2006.

23      In Cobb, the United States Supreme Court declined to adopt the view of some lower courts that

24  if a charged offense is "factually related" to an uncharged offense, the Sixth Amendment right to

25  counsel attaches.  The Supreme Court held that when the Sixth Amendment right to counsel attaches, it

26  encompasses offenses that "even if not formally charged, would be considered the same offense under

27  the Blockburger test."  Id. at 173.  The Blockburger test requires that "'where the same act or

28  transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine

whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" Id. (citing Blockburger v. United States, 284 U.S. 299, 304 (1932)).

Inman's state charge for introducing drugs into the state prison and his pending RICO conspiracy charge do not meet the Blockburger test. They are not the same offenses. Thus, although Inman had counsel at the time he was questioned in CCDC, he did not have a Sixth Amendment right to counsel with respect to uncharged offenses. Inman testified he was not asked any questions about his pending state case. His Sixth Amendment right to counsel was not violated when Reynolds and Johnson questioned him, after administering Miranda warnings, about uncharged offenses.

For all of the foregoing reasons,

**IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that Inman's Motion to Suppress (Dkt. #405) be **DENIED**.

Dated this 13th day of March, 2009.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE

22